**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK**

---

JOHN KANE,

           Plaintiff,        1:18-cv-01355 (BKS/CFH)

v.

CLUB HELSINKI,

           Defendant.

---

**Appearances:**

*For Plaintiff:*
Michael H. Sussman
Sussman & Associates
1 Railroad Avenue
P.O. Box 1005
Goshen, NY 10924

*For Defendant:*
Scott C. Paton
Glen P. Doherty
Hodgson Russ LLP
677 Broadway, Suite 301
Albany, New York 12207

**Hon. Brenda K. Sannes, United States District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I.  INTRODUCTION

Plaintiff John Kane brings this action under Title VII of the Civil Rights Act of 1964

("Title VII"), *as amended*, 42 U.S.C. § 2000e *et seq*., against Defendant Club Helsinki LLC[1]

("Club Helsinki") alleging that he was subjected to *quid pro quo* sexual harassment when his

---

[1] Plaintiff identified Defendant as "Club Helsinki" in the Complaint, but the Defendant's proper name is "Club Helsinki LLC." (Dkt. No. 30-1, at 1). The Clerk is directed to correct the name on the docket.

hours were reduced and his employment was terminated after he refused the sexual advances of a supervisor. (Dkt. No. 1). Presently pending before the Court is Defendant's motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. (Dkt. No. 30). The motion is fully briefed, with an opposition and reply. (Dkt. Nos. 31-34, 36). For the reasons set forth below, Defendant's motion is denied.

## II.   FACTS[2]

### A.   Plaintiff's Employment at Club Helsinki

Defendant operates Club Helsinki, a music venue, restaurant, and event space located in Hudson, New York, (Dkt. No. 32, at 1). In May 2016, Plaintiff began working at Club Helsinki as a bartender. (Dkt. No. 32, at 1). During the entire time Plaintiff worked at Club Helsinki, Austin Sullivan was the Director of Operations. (*Id.* at 2). In this role, Sullivan oversaw scheduling "front-of-house" employees, which included hosts, servers, food runners, bussers, and bartenders. (Dkt. No. 33-4, at 38). Sullivan made the schedule every week and sent it to employees via e-mail. (*Id*. at 39; *see* Dkt. Nos. 33-9, 33-10). Sullivan also had the authority to hire and fire employees. (Dkt. No. 38-1, at 2). During Plaintiff's employment, Marc Schafler held a supervisory and managerial role overseeing the operations of Club Helsinki. (Dkt. No. 30-7, ¶ 3; Dkt. No. 32, at 1).

Sullivan "understood that [Plaintiff] was gay from the beginning" of Plaintiff's employment at Club Helsinki. (Dkt. No. 33-4, at 53). Plaintiff and Sullivan had a "social relationship" that existed outside of work, and Sullivan considered Plaintiff a friend. (Dkt. No. 32, at 14; Dkt. No. 33-4, at 50-52). On August 6, 2016, Sullivan send Plaintiff an e-mail

---

[2] The facts have been drawn from Defendant's statement of material facts, (Dkt. No. 30-1), Plaintiff's response, (Dkt. No. 32), and Defendant's reply to Plaintiff's counterstatement of facts, (Dkt. No. 38-1), as well as the attached exhibits, depositions, and affidavits. The facts are taken in the light most favorable to Plaintiff. *Gilles v. Repicky*, 511 F.3d 239, 243 (2d Cir. 2007).

informing him that he was "[a]lways hearing great things about" Plaintiff at Club Helsinki, and

that Sullivan "wholeheartedly appreciate[d] that just in case [Plaintiff] didn't know." (Dkt. No.

33-4, at 118). Sullivan testified that he sent the e-mail because he "had heard good things as it

related to [Plaintiff's] service." (*Id.*).

B.     **Sexual Harassment Allegations**

At his deposition, Plaintiff testified as follows. Sullivan sexually propositioned Plaintiff

in Sullivan's office in the fall of 2016, either in October or November, "or possibly the very last

weekend of September." (Dkt. No. 33-3, at 53). Plaintiff told Sullivan that he "would like to do

more work and make a little bit more money," and in response Sullivan said he "used to sleep

with his manager to get shifts, and did [Plaintiff] want better shifts." (*Id.* at 55). Sullivan was

seated in a "swivel chair," and turned towards Plaintiff "and sort of spread his legs." (*Id.*).

Plaintiff did not say anything in response and left the room. (*Id.*). After this incident, Plaintiff

attempted to avoid Sullivan by "minimiz[ing] any personal talk and keep[ing] physical distance

from [Sullivan] to avoid any inappropriate touching or suggestion that [Plaintiff] might be

interested." (*Id.* at 56-57). Sullivan sometimes "rub[bed] shoulders, slap[ped] butts, [and acted]

suggestively to [Plaintiff] and other male employees." (*Id.* at 57). Sullivan ceased these

behaviors towards Plaintiff "[w]ithin weeks" of Plaintiff rejecting Sullivan's proposition. (*Id.* at

99). Sullivan denies ever sexually propositioning Plaintiff by indicating that he would receive

better shifts by "sleeping" with Sullivan. (Dkt. No. 30-8, ¶ 10). Sullivan also denies ever

engaging in "unwanted physical touching." (*Id.* ¶ 11).

Plaintiff testified that he began to see a decrease in the shifts he was scheduled to work in

"early December," "when they hired another bartender." (Dkt. No. 33-3, at 61). Staff schedules

show that between July 2016 and December 2016, Plaintiff was generally assigned four to six

shifts a week. (Dkt. No. 33-7, at 11-36). Beginning in January, Plaintiff's shifts were cut roughly

3

in half and he was never assigned more than three shifts a week for the remainder of his employment. (*Id*. at 28-29, 38-48).[3]

Plaintiff testified that a newly hired bartender, John Spoto, took "at least two" of Plaintiff's shifts each week. (*Id.* at 120). Sullivan testified that Spoto had previously worked at Club Helsinki, and was rehired for "approximately five weeks in January and the first week of February 2017." (Dkt. No. 33-4, at 87). Spoto first appears on the staff schedule for the first week of January. (Dkt. No. 33-7, at 39). Spoto was generally assigned two shifts a week during January 2017 and the first week of February 2017. (*Id*. at 28-29, 38-40).

### C.    Complaints About Plaintiff

Sullivan testified that he reduced Plaintiff's hours because servers complained that Plaintiff was trying to take their tables and customers complained that Plaintiff had inappropriate conversations about sex. (Dkt. No. 33-4, at 108). In an affidavit in support of the motion for summary judgment Sullivan averred that he did not reduce Plaintiff's shifts because of any "supposed advances" being rejected, and that fluctuations in the frequency of Plaintiff's shifts "depended on whether the Club was busy or not at that particular time." (Dkt. No. 30-8, ¶ 12). Sullivan stated that Plaintiff's shifts "became more on the music-venue side of the Club, as opposed to the restaurant side" in response to "the complaints [Club Helsinki] had received from servers and customers alike concerning Plaintiff's conduct while working the bar at the Club's restaurant." (Dkt. No. 30-8, ¶ 12). Sullivan did not discuss why Plaintiff's shifts were being reduced with Plaintiff. (Dkt. No. 33-4, at 109-10).

---

[3] According to Defendant, employees were not assigned a consistent number of shifts and the reduction in shifts Plaintiff experienced was not isolated to Plaintiff. (Dkt. No. 38-1, ¶ 4). The staff schedule reflects that scheduling was not consistent from week to week. For example, during one week in March multiple employees, including Plaintiff, had only a single shift, or were not scheduled to work at all. (Dkt. No. 33-7, at 45). The following week, every employee was scheduled to work, and most employees, including Plaintiff, had at least three shifts. (*Id*. at 46).

Sullivan testified that he received complaints from servers that Plaintiff "sent servers home" to take the tables they were serving and earn more money in tips. (Dkt. No. 33-4, at 59-61; Dkt. No. 30-8, ¶ 5). Sullivan identified two servers who complained that Plaintiff asked them to go home so he could take over their tables. (Dkt. No. 33-4, at 109). Sullivan averred that he also "received complaints from both servers and some of [the] restaurant customers that Plaintiff's off-color sexual comments made them feel uncomfortable." (Dkt. No. 30-8, ¶ 5). Sullivan testified that he also received a complaint from the father of two former teenage Club Helsinki employees regarding Plaintiff "speaking a little too gay to his sons." (Dkt. No. 33-4, at 88, 90; Dkt. No. 33-3, at 76). According to Sullivan, the father complained that his son had been made uncomfortable "by a conversation [Plaintiff] had with him." (Dkt. No. 33-4, at 91). Sullivan testified that he informed Schafler about this conversation, but did not recall whether he discussed it with Plaintiff. (*Id*. at 89, 91). Sullivan did not speak to either of the Club Helsinki employees, and did not know which son was involved in the conversation. (*Id*. at 92).

In addition to these complaints, Sullivan claims he received "a series of complaints" from a "long-time bartender" named Jessica Sanchez. (Dkt. No. 30-8, ¶ 5). According to Sullivan, Sanchez claimed that when "she would work the bar on the restaurant side of the Club, and Plaintiff was working the bar in the concert venue, Plaintiff was often rude, hostile and aggressive." (*Id*. ¶ 6). Sanchez informed Schafler that she had heard that Plaintiff "had made several customers uncomfortable by engaging in sexually explicit conversation that often involved graphic content." (Dkt. No. 30-6, ¶ 6; Dkt. No. 30-7, ¶ 5).

Sanchez submitted an affidavit stating that she informed Sullivan of one specific incident that occurred in early 2017, where "Plaintiff shoved a rack of glassware into [her], and screamed at her to stay away from his side of the bar." (Dkt. No. 30-8, ¶ 7; Dkt. No. 30-6, ¶ 7). According

5

to Sanchez, Plaintiff shouted at her to "take [her] shit and get out of here!" (Dkt. No. 30-6, ¶ 7).
After this incident, Sanchez informed Sullivan that she "was no longer comfortable working
alongside Plaintiff, and that [she] did not feel safe working the same shifts as him." (Dkt. No. 30-
6, ¶ 8; Dkt. No. 30-8, ¶ 7). Sanchez averred that she reported the incident to both Sullivan and
Schafler. (Dkt. No. 30-6, ¶ 8). Schafler averred that he learned about this incident, "in or about
March of 2017" from Sullivan, (Dkt. No. 30-8, ¶¶ 7-8; Dkt. No. 30-7, ¶ 6), and then spoke to
Sanchez about what occurred, (Dkt. No. 30-7, ¶ 7). Sullivan was not present for this incident, and
never spoke with Plaintiff about what happened. (Dkt. No. 33-4, at 85). Plaintiff's personnel file
contains an "Employee Disciplinary Action Form" documenting this incident. (Dkt. No. 33-23,
at 34). The form lists April 2, 2017 as the "date of warning," but the section on the form for an
employee's signature verifying that he has read and received the warning is blank. (*Id.*). [4]

Plaintiff testified that while he had "somewhat" negative interactions with Sanchez
during their time working together due to her "very different style[]," he never pushed a cart of
glasses against her or had any type of physical altercation with her. (Dkt. No. 33-3, at 73-74). As
a bartender, Plaintiff did talk about sex with customers, because "[t]hat is part of being a
bartender." (*Id.* at 77). He "[s]ometimes" discussed sex and his personal life with coworkers but
was never told to stop by his coworkers. (*Id.*). Plaintiff denied ever making any sexual advances
towards teenage employees at Club Helsinki, and did not recall having any "sexual discussions"
with either of the employees whose father allegedly complained. (*Id.* at 76).

The parties dispute whether Sullivan ever spoke with Plaintiff, during his employment,
about any complaints from customers or coworkers. (Dkt. No. 38-1, at 16). Plaintiff testified that

---

[4] The only other document in the personnel file that appears to refer to a complaint against Plaintiff is a page of typed
messages which appear to contain an unknown individual's complaints about Plaintiff yelling at unidentified
individuals. (Dkt. No. 33-23, at 35).

neither Schafler nor Sullivan ever spoke to him concerning any work-related or performance

concerns, (Dkt. No. 33-3, at 168-69), and Sullivan testified that he did have a conversation with

Plaintiff about sending servers home early. (Dkt. No. 33-4, at 61).

### D.    Plaintiff's Attempts to Report Sullivan's Conduct

In December 2016, Plaintiff testified that another employee, Luke LaMarca,[5] asked

Plaintiff "why [Plaintiff] was losing shifts." (Dkt. No. 33-3 at 57). Plaintiff "confided in

[LaMarca] that Mr. Sullivan had made an inappropriate advance, that [Plaintiff] had rebuffed

him, that [Plaintiff] was trying to keep [his] distance from him and as a result, [Sullivan] was

acting more hostilely towards [Plaintiff]." (*Id.*).

Plaintiff testified that he told LaMarca he wanted to speak with Schafler about Sullivan's

proposition, and LaMarca said that Schafler would "probably sit there and listen to [Plaintiff]

and then fire [him]." (Dkt. No. 33-3 at 110). Plaintiff further testified that LaMarca advised

Plaintiff that "the best thing for [Plaintiff] to do would just be to go quietly" and find a new job.

(*Id.* at 111).

According to Plaintiff, he attempted to discuss Sullivan's proposition with Schafler, and

"let [him] know several times that [Plaintiff] would like to speak to him privately." (*Id.* at 85). In

response, Schafler told Plaintiff to "come see him during off hours," which Plaintiff tried to do.

(*Id.*). Plaintiff testified that because these discussions "generally" took place "on the floor during

service," he told Schafler only that "[i]t was serious and [that Plaintiff] wanted to speak to him in

private," but did not elaborate as there were customers and employees present. (*Id.* at 86).

---

[5] Plaintiff believed LaMarca had the title of "assistant manager" or "closing manager," and had "the authority to send people home." (Dkt. No. 33-3, at 67). Depending on who was present while Plaintiff was working, Plaintiff felt that both LaMarca and Sullivan acted as Plaintiff's immediate boss. (*Id*. 67-68, 94). Schafler denies that LaMarca was a manager, and averred that LaMarca was a "part-time employee who checked IDs at the front door," "helped close the Club at the end of the evening," and "had no supervisory authority over Plaintiff." (Dkt. No. 30-7, ¶ 11). Whether LaMarca was a manager is immaterial to the resolution of this summary judgment motion.

Plaintiff contacted Schafler "[a]t least four or five" times to ask to meet with him, but did not

receive a response. (*Id.* at 86, 91-92; *see* Dkt. No. 33-13). Plaintiff testified that he did not want

to put his allegations towards Sullivan in an e-mail, because he did not want to "be ignored" or

risk miscommunicating what happened. (*Id.* at 103).

On January 11, 2017, Sullivan sent the following e-mail to all employees: "unless you're

scheduled [to work], please don't be in the building during the day, or anywhere back of house

on any evening you're not on the floor." (Dkt. No. 33-11, at 2). Plaintiff testified that this e-mail

came right after his attempts to reach Schafler, and that he felt Schafler was avoiding him. (Dkt.

No. 33-3, at 85-87).

Sullivan testified that at the time he sent the email, he did not know that Plaintiff was

trying to contact Schafler, (Dkt. No. 34-4, at 98), and that he instituted the policy after Hugh

Horner, Club Helsinki's chef, reported that he saw Plaintiff coming out of an office in which

cash, checks, and employee data was stored, (Dkt. No. 34-4, at 128). Sullivan never discussed

this with Plaintiff. (*Id*. at 129). Sullivan averred that the e-mail "was not directed at Plaintiff, but

was sent to all employees, in an effort to keep staff from loitering when they were not otherwise

supposed to be present, as their doing so tended to interfere with Club operations." (Dkt. No. 30-

8, ¶ 13).

Schafler denies that the new policy was a "rebuke" of Plaintiff's attempts to meet, and

averred that as he was "physically present at the Club at least 5-7 days per week," Plaintiff

"would have had little difficulty tracking [him] down if [Plaintiff] felt the need to meet." (Dkt.

No. 30-7, ¶ 13). Schafler testified that the policy was put in place, and the e-mail sent out, as a

result of Horner seeing Plaintiff walk out of an unlocked office "[a]t a point in time that

[Plaintiff] should not have been coming out of the office." (Dkt. No. 33-5, at 19). Schafler did

not speak with Plaintiff about the incident, but thought both Horner and Sullivan spoke to Plaintiff, although he "[didn't] know for sure" if Sullivan did. (*Id*. at 19-20).

Plaintiff testified that during their December 2016 conversation, LaMarca informed Plaintiff that Sullivan had previously "behaved inappropriately towards other male employees during an annual trip to Atlantic City," and had been "fired from his previous job as the manager of Santa Fe [a local restaurant] for sending . . dick pics to a minor who was an employee of his." (Dkt. No. 33-3, at 65). Plaintiff testified that he confirmed this information with another former employee at Santa Fe, "a nurse at [Plaintiff's] doctor's office who also worked with [Sullivan]." (*Id.* at 68).

Sullivan testified that he was not terminated, and left Santa Fe in 2011 on a "mutual understanding that he would be leaving" because he was starting a family. (Dkt. No. 33-4 at 14). Sullivan also testified that the year he left Santa Fe, an employee accused him of being inappropriate after Sullivan texted the employee a picture of male genitalia. (Dkt. No. 33-4, at 103). Sullivan acknowledged sending the picture, but stated that he sent it in a "joking manner." (*Id.*).

### E.    Plaintiff's Termination

Plaintiff was terminated in early April of 2017. (Dkt. No. 33-19). The parties dispute what happened at the termination meeting. Plaintiff testified that he was taken into an office where both Sullivan and Shafler were present and Sullivan "told [him] that they were going into a slow season, they didn't need as many people and they were letting [Plaintiff] go." (Dkt. No. 33-3 at 105). However, Plaintiff felt that Club Helsinki was coming out of a slow season because as the weather gets warmer, "shows pick up and people start going out to eat again." (*Id.* at 106). Schafler did not speak at all during the termination meeting, and after his termination Plaintiff e-

mailed Schafler and told him they still needed to speak about a "situation that has been ongoing for some time." (*Id.* at 106-07; Dkt. No. 33-17 at 2). Schafler did not respond. (*Id.* at 106-07).

Defendant asserts that it was Schafler, not Sullivan who terminated Plaintiff. Schafler averred that he "decided to terminate Plaintiff's employment" based on complaints he had received regarding Plaintiff. (Dkt. No. 30-7, ¶ 8). Schafler stated that long-time employees Kelly and Sanchez informed him that Plaintiff "would often make rude and inappropriate comments to customers." (*Id.* ¶ 5). Schafler was also informed by Sullivan that Plaintiff "had become hostile and aggressive towards [Sanchez], and that he had shoved a rack of bar glasses into her, and yelled at her in front of patrons." (*Id.* ¶ 6). Schafler confirmed these accounts with Sanchez and Kelly. (*Id.* ¶ 8). According to Schafler, he terminated Plaintiff at a meeting in his office in April 2017, during which he told Plaintiff "that business was slow at the Club, and that [they] no longer needed [Plaintiff's] services." (*Id.* ¶ 9). Additionally, Schafler averred that business "had slowed quite a bit, and there were not enough shifts to go around." (*Id.*). He did not tell Plaintiff that the complaints "were a big part of why [Plaintiff] was being fired" because Schafler "wanted to avoid a 'he said/she said' confrontation." (*Id.*). Schafler denies that Plaintiff's termination was "in response to the fact that he had rebuffed Mr. Sullivan's supposed advances," (*id.*), and averred that he only learned about the alleged proposition when he was "served with papers that Plaintiff had filed with the EEOC," (*id.* ¶ 10).

For his part, Sullivan agreed he was present at Plaintiff's termination meeting but denies that he was the one who terminated Plaintiff. (Dkt. No. 33-4, at 83-84). He testified that he did inform Schafler that Plaintiff "had an altercation with a female employee [at Club Helsinki]." (*Id.* at 84). Sullivan testified that he "didn't recommend one way or another if [Plaintiff] be terminated," but rather "gave [Schafler] the information needed for [Schafler] to make his

decision." (*Id.* at 85). Sullivan testified that at the termination meeting, Schafler informed Plaintiff he was being terminated because "business was slow, and the Club did not need his services at that time," (Dkt. No. 30-8, ¶ 9). Sullivan denies that "[Plaintiff's] termination was in response to the fact that he had rebuffed my supposed advances," and states that "Mr. Shafler [sic] terminated Plaintiff's employment" for reasons that "had nothing to do with any fictitious sexual advances on [Sullivan's] part, or Plaintiff's 'rejection' of the same." (*Id.* ¶ 14).

In a letter dated April 7, 2017, Schafler wrote Plaintiff that he was being terminated "for the following reason: We have decided to implement a work force reduction and your position has been eliminated." (Dkt. No. 33-19, at 2).

### F.     EEOC Charge

On December 8, 2017, Plaintiff filed a verified charge with the Equal Employment Opportunity Commission (the "EEOC"). (Dkt. No. 32, at 13; Dkt. No. 30-3, at 8-12). Plaintiff alleged *quid pro quo* sexual harassment based on his loss of shifts and termination after rejecting Sullivan's proposition. (*Id.* at 11-12). In response, Schafler submitted an affidavit denying knowledge "of any such alleged behavior by Mr. Sullivan." (Dkt. No. 33-18, ¶ 6). Schafler stated that Plaintiff's hours "were reduced after holidays," as "part of an overall reduction in workforce" and that Plaintiff was terminated "as part of our seasonal staff reduction." (*Id.* ¶¶ 7, 8). Schafler did not refer to any other basis for the termination in his letter to the EEOC. Sullivan also submitted an affidavit in response to the EEOC charge. (Dkt. No. 33-20). With respect to "the allegation that [Plaintiff's] hours were cut in half," Sullivan stated that "employee scheduling is based solely upon the needs of the club." (*Id.* ¶ 12). Sullivan stated that at the time of his termination Plaintiff was informed that "his termination had to do with the diminished staffing needs" and "nothing to do with" Plaintiff, and that upon Plaintiff's termination, he "was

offered the opportunity to work in the future on a per diem basis if and when the business of [Defendant] improved." (*Id.* ¶¶ 13-14).

On August 24, 2018, the EEOC issued Plaintiff a right to sue letter. (Dkt. No. 30-3, at 15-16). Plaintiff filed the Complaint on November 19, 2018. (Dkt. No. 1).

## III.   STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (summary judgment appropriate where the nonmoving party fails to "'come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on' an essential element of a claim" (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010))).

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323–24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary

judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc*. *v*. *CIS Air Corp*., 352 F.3d 775, 780 (2d Cir. 2003). Still, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec*. *Indus*. *Co*. *v*. *Zenith Radio Corp*., 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight v*. *U.S*. *Fire Ins*. *Co*., 804 F.2d 9, 12 (2d Cir. 1986) (quoting *Quarles v*. *Gen*. *Motors Corp*., 758 F.2d 839, 840 (2d Cir. 1985)). Furthermore, "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v*. *Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v*. *Atex, Inc*., 68 F.3d 1451, 1456 (2d Cir. 1995)).

## IV.    DISCUSSION

### A.    Title VII – Timeliness

Plaintiff claims that Defendant violated Title VII by reducing his hours and terminating his employment after Plaintiff rejected a sexual proposition from Sullivan, constituting *quid pro quo* sexual harassment. (Dkt. No. 1). Defendant argues that Plaintiff's claim is untimely. (Dkt. No. 30-9, at 16-19).

"As a precondition to filing a Title VII claim in federal court, a plaintiff must first pursue available administrative remedies and file a timely complaint with the EEOC." *Hardaway v*. *Hartford Pub*. *Works Dep't*, 879 F.3d 486, 489 (2d Cir. 2018) (quoting *Deravin v*. *Kerik*, 335 F.3d 195, 200 (2d Cir. 2003)); *see also* 42 U.S.C. § 2000e–5(e) and (f). "Title VII requires that individuals aggrieved by acts of discrimination [in states like New York] file a charge with the EEOC within . . . 300 days 'after the alleged unlawful employment practice occurred.'" *Vega v*. *Hempstead Union Free Sch*. *Dist*., 801 F.3d 72, 78-79 (2d Cir. 2015) (quoting 42 U.S.C.

Case 1:18-cv-01355-BKS-CFH   Document 39   Filed 06/16/21   Page 14 of 24

§ 2000e–5(e)(1)). Failing to timely file a charge "acts as a bar to a plaintiff's ability to bring the action." *Semper v. N. Y. Methodist Hosp.*, 786 F. Supp. 2d 566, 576 (E.D.N.Y. 2011) (citing *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982)). Though time-barred, discrete prior acts falling outside the limitations period may be used as "background evidence in support of a timely claim." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002).

Here, Plaintiff alleges that Sullivan's proposition occurred at some point between late September and November 2016. (Dkt. No. 33-3, at 53-54). Plaintiff alleges that his rejection of that proposition resulted in Plaintiff's shifts being reduced beginning in December 2016, as well as his eventual termination in April 2017. (*Id.* at 69-70, 120). Since Plaintiff filed his EEOC charge on December 8, 2017, (Dkt. No. 32, at 13), the only alleged act that occurred within the 300-day period, i.e., on or after February 11, 2017, is Plaintiff's termination. Defendant argues that because Plaintiff's claim is premised on an alleged sexual proposition that occurred outside the 300-day window, Plaintiff's *quid pro quo* claim is time-barred. (Dkt. No. 30-9, at 16-19).

The Court disagrees. "The tort of *quid pro quo* sexual harassment is comprised of both unwanted sexual advances and a tangible change in plaintiff's employment because of [his] reaction to that intrusive attention." *See Engelmann v. National Broadcasting Co.*, No. 94-cv-5616, 1996 WL 76107, at *14, 1996 U.S. Dist. LEXIS 1865, at *39-40 (S.D.N.Y. Feb. 21, 1996). "The 'alleged unlawful employment practice' that triggers the statute of limitations includes both elements of this claim." *Id.*, 1996 U.S. Dist. LEXIS 1865, at *40. Here, Plaintiff did not have an actionable *quid pro quo* claim until an adverse employment action was taken against him, such as terminating his employment or reducing his hours. *See Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir. 2006) ("When a plaintiff proves that a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands, he or she establishes that the

14

employment decision itself constitutes a change in the terms and conditions of employment that is actionable under Title VII."). Because Plaintiff filed his claim within 300 days of his termination, his claim based on that termination is timely. *See, e.g., Engelmann*, 1996 WL 76107, at *14, 1996 U.S. Dist. LEXIS 1865, at *40 (finding claim for quid pro quo harassment timely when the plaintiff filed her EEOC complaint within 300 days of her termination); *Farjam v. New York Health & Hosp. Corp.*, 2000 U.S. Dist. LEXIS 3741, at *46 (S.D.N.Y. Mar. 23, 2000) (same).[6]

Plaintiff argues that his quid pro quo claim based on the reduction of hours is also timely because filing the complaint "within 300 days of the last act of prohibited discrimination" "ma[de] timely the entire sequence of wrongful conduct." (Dkt. No. 31, at 13). The Court disagrees.

> [D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging that act. The charge, therefore must be filed within the . . . 300-day time period after the discrete discriminatory act occurred. . . . [T]he statute does not bar an employee from using the prior acts as background evidence in support of a timely claim.

*Morgan*, 536 U.S. at 113. Discrete acts include "termination, failure to promote, denial of transfer, or refusal to hire," and "[e]ach incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'" *Id*. at 114. Therefore, a plaintiff may "only file a charge to cover discrete acts that 'occurred' within the appropriate time period." *Id*.

Plaintiff argues that his reduction-in-hours claim is timely under the continuing violation doctrine. (Dkt. No. 31, at 11-12). The continuing violation doctrine "permits consideration of an

---

[6] No Westlaw citation is available.

incident preceding the limitations period" if there was an "offensive incident within the

limitations period" and "the incidents are sufficiently related." *McGullam v. Cedar Graphics,*

*Inc.*, 609 F.3d 70, 77 (2d Cir. 2010). However, in the Title VII context, the continuing violation

doctrine typically applies, if at all, to hostile work environment claims, which "are different in

kind from discrete acts," that occur on a particular day; "the entire hostile work environment

encompasses a single unlawful employment practice." *Morgan*, 536 U.S. at 115, 117; *see also*

*Van Steenburgh v. Rival Co*. 171 F.3d 1155, 1159 (8th Cir. 1999) ("Unlike quid pro quo

harassment or other 'discrete' forms of sex discrimination, hostile environment harassment is an

'ongoing nightmare for the employee victim, in legal parlance, a continuing violation.'")

(internal citations and quotations omitted). Plaintiff has expressly disclaimed a hostile

environment claim. (Dkt. No. 31, at 14). The continuing violation doctrine cannot save a claim

when a discrete act occurred outside the statutory period. *See Morgan*, 536 U.S. at 115 ("All

prior discrete discriminatory acts are untimely filed and no longer actionable."); *see also Lowber*

*v. City of New Cordell*, 298 F. App'x 760, 761 n.2 (10th[h] Cir. 2008) ("We note that . . . the

'continuing violation' theory [] was rejected by the Supreme Court with respect to discrete

discriminatory acts in *National Railroad Passenger Corp. v. Morgan*[.]")

Plaintiff's reduction in hours is an adverse employment action. *Deveaux v. Skechers USA,*

*Inc.*, No. 19-cv-9734, 2020 WL 1812741, at *4, 2020 U.S. Dist. LEXIS 63356, at *7 (S.D.N.Y.

Apr. 9, 2020) (finding "reduction in hours [from 40 hours a week to 25] constitutes an adverse

employment action"); *Green v. Rochdale Vill. Soc. Servs.*, No. 15-cv-5824, 2016 WL 4148322,

at *4, 2016 Dist. LEXIS 102697, at *12 (E.D.N.Y. Aug. 4, 2016) (noting the plaintiff's

"reduction in hours constitutes an adverse employment action"). Once Plaintiff's hours were

reduced, Plaintiff had an actionable *quid pro quo* claim based on that adverse employment

action. Because staff schedules reflect that Plaintiff's shifts were decreased in January, (Dkt. No.

33-7 at 28-29, 38-48), prior to February 2017, any claim based on the reduction in Plaintiff's

hours is time-barred. *See Thanning v. Gulotta*, 898 F. Supp. 134, 139-40 (E.D.N.Y. 1995)

(allowing *quid pro quo* claim premised on the plaintiff's termination, but not the denial of

seniority, to proceed because "[a]lthough plaintiff's termination occurred within the permissible

time period, the denial of seniority occurred outside the period").

      Plaintiff's claim is not saved because he continued to work reduced hours in February

and March. Staff schedules show that after Plaintiff's hours were reduced in January, he did not

experience any further meaningful reduction in hours during the months of February and March.

(*See* Dkt. No. 33-7, at 28-29, 38-47 (Plaintiff was assigned 11 shifts in January, 10 shifts in

February, and 9 shifts in March)). The initial reduction of Plaintiff's hours in January was an

actionable, discrete act— one which is time-barred—and the reduced hours in February and

March are the continued effects of that discrete act, and not independently actionable. *See*

*Guerrero v. FJC Sec. Servs.,* No. 10-cv-9027, 2012 WL 2053535, at *3, 2012 U.S. Dist. LEXIS

79553, at *9 (S.D.N.Y. June 5, 2012) (finding that the plaintiff's complaints "that he was

assigned to a four-day-per-week work schedule" are time barred because "[t]hough Plaintiff

continued thereafter to feel the effects of this assignment, the assignment occurred in May 2009"

"over 300 days after the date of the alleged discriminatory schedule assignment"); *Baird v.*

*Outlook Pointe*, No. 07-cv-1580, 2008 WL 4287382, at *6, *10, 2008 U.S. Dist. LEXIS 71458,

at *16, *26-28 (M.D. Pa. Sept. 17, 2008) (noting that reduction of hours constitutes a discrete

act, and finding claim to be untimely where the plaintiff could not show that hours were further

reduced within 300-day period).

"The statute of limitations requires that only one alleged adverse employment action have occurred within the applicable filing period," and "evidence of an earlier alleged retaliatory act may constitute relevant 'background evidence in support of [that] timely claim.'" *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 177 (2d Cir. 2005) (citing *Morgan*, 536 U.S. at 113). The reduction in Plaintiff's hours, although not actionable because it pre-dates February 2017, "might nonetheless remain admissible at trial and could lead a rational jury to find a causal link between the protected activity and the actionable adverse acts." *Id.*; *see Doe v. University of Connecticut*, No. 09-cv-1071, 2013 WL 4504299, at *9, 2013 U.S. Dist. LEXIS 119251, at *29 (D. Conn. Aug. 22, 2013) ("Therefore, as to the events [outside the statutory period], with respect to plaintiff's *quid pro quo* claims under Title VII, evidence may be introduced only as "relevant background evidence" upon which plaintiff shall not dwell at trial.").

### B.     *Quid Pro Quo* Sexual Harassment

"To establish a *prima facie* case of *quid pro quo* harassment, a plaintiff must present evidence that [he] was subject to unwelcome sexual conduct, and that [his] reaction to that conduct was then used as the basis for decisions affecting the compensation, terms, conditions or privileges of [his] employment." *Fitzgerald v. Henderson*, 251 F.3d 345, 356 (2d Cir. 2001) (quoting *Karibian v. Columbia Univ.*, 14 F.3d 773, 777 (2d Cir. 1994)). "An employee must show a tangible employment action, i.e., that an explicit alteration in the terms or conditions of employment resulted from refusal to submit to a supervisor's sexual advances." *Rivera v. New York City Dep't of Corr.*, 951 F. Supp. 2d 391, 399-400 (E.D.N.Y. 2013) (citing *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 603, 604 (2d Cir. 2006)). "The relevant inquiry in a *quid pro quo* case is whether the supervisor has linked tangible job benefits to the acceptance or rejection of sexual advances." *Karibian*, 14 F.3d at 778. "The requirements to establish a prima facie case are 'minimal,' and a plaintiff's burden is therefore 'not onerous.'" *Bucalo v. Shelter Island*

*Union Free Sch. Dist.*, 691 F.3d 119, 128 (2d Cir. 2012) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

### 1.      Prima Facie Case

Defendant argues that Plaintiff has failed to show that his termination resulted from his alleged refusal to submit to Sullivan's proposition because the two events occurred too far apart for Plaintiff to show causation. (Dkt. No. 30-9, at 11-14). Plaintiff argues that the time period is not beyond the limits from which a causal relationship could be inferred.[7] (Dkt. No. 31, at 15).

"A plaintiff may indirectly establish a causal connection between the alleged conduct and the adverse action merely by showing that the two events occurred in close temporal proximity to each other." *Grossman v. Maplewood Sch.*, No. 11-cv-4580, 2012 WL 3878238, at *4, 2012 U.S. Dist. LEXIS 126966, at *9 (E.D.N.Y. Sept. 6, 2012). The Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship," *Gorman-Bakos v. Cornell Coop. Extension*, 252 F.3d 545, 554 (2d Cir. 2001), but the temporal proximity must be "very close." *Clark County Sch. Dist. v Breeden*, 532 U.S. 268, 273 (2001). In one instance, the Second Circuit allowed a four month lapse to serve as indirect evidence of a causal connection, *Gorman-Bakos*, 252 F.3d at 555, and in another found that a three-and-a-half month interval was too long, *Hollander v. American Cyanamid Co.*, 895 F.2d 80, 84-85 (2d Cir. 1990).

---

[7] The parties dispute whether it was Sullivan who terminated Plaintiff. Plaintiff testified that it was Sullivan. (Dkt. No. 33-3 at 105). In any event, although Sullivan testified that he did not terminate Plaintiff, he was present when Plaintiff was terminated and did "provide[] information to [Schafler] that [Schafler] based his decision on." (Dkt. No. 33-4, at 83-84). "As the Second Circuit has recognized, employment decisions that are made collectively can be tainted by the bias of a single biased individual so long as the biased party played a 'meaningful role' in the decision-making process." *Richardson-Holness v. Alexander*, 196 F. Supp. 3d 364, 371 (E.D.N.Y. 2016) ((citing *Bickerstaff v. Vassar College*, 196 F.3d 435, 450 (2d Cir. 1999)).

Here, Plaintiff has not given a precise date for when Sullivan allegedly propositioned him. He testified during his deposition that it likely occurred in October or November 2016, or "possibly the very last weekend of September." (Dkt. No. 33-3, at 53-54). Considering the facts in the light most favorable to Plaintiff and assuming Sullivan made the comment in November 2016 at the latest, five months elapsed between Sullivan's comment and Plaintiff's termination in April 2017. The Second Circuit has previously held that five months is not too long to find the requisite causal relationship. *See Gorman-Bakos*, 252 F.3d at 555 ("We are particularly confident that five months is not too long to support [an allegation of a causal connection] where plaintiffs have provided evidence of exercises of free speech and subsequent retaliatory actions occurring" between the time of the protected activity and the adverse action). As in *Gorman-Bakos*, here there is evidence of another incident during the five-month time period from which a jury could infer causation. The jury may consider, as background evidence, Plaintiff's testimony that Sullivan reduced his shifts in January 2017, after Plaintiff rejected Sullivan's proposition, in October or November 2016, "to sleep with his manager to get shifts." Given the evidence that Plaintiff's hours were reduced one to two months following his rejection of Sullivan's alleged proposition for getting more shifts, and construing all of the facts in the light most favorable to Plaintiff, the Court finds that under these circumstances, while the evidence is thin, five months is not too long to infer a causal connection between Sullivan's alleged sexual proposition and Plaintiff's termination. *See Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 254 (2d Cir. 2014) (noting that in the retaliation context, temporal proximity of "five months might be enough to establish a prima facie case"); *see also Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009) (noting that lack of "bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish [causation] . . . has allowed our Court to exercise its judgment about

the permissible inferences that can be drawn from temporal proximity in the context of particular cases") (internal quotations omitted). Plaintiff has therefore satisfied his minimal burden establishing a prima facie case of *quid pro quo* sexual harassment.

### 2.    Legitimate Nondiscriminatory Reason

"[C]laims brought under Title VII for quid pro quo sexual harassment . . . are subject to the burden-shifting standard set forth in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 []." *Clarke v. Pacifica Found.*, No. 07-cv-4605, 2011 WL 4356085, at *8, 2011 U.S. Dist. LEXIS 105468, at *27 (E.D.N.Y. Sept. 16, 2011). The "[e]stablishment of a prima facie case . . . creates a presumption that the employer unlawfully discriminated against the employee." *Burdine*, 450 U.S. at 254. The burden then shifts to the Defendant who must articulate a "legitimate, nondiscriminatory reason" for terminating Plaintiff. *McDonnell Douglas Corp.*, 411 U.S. at 802. Defendant's burden "is not a particularly steep hurdle." *Hyeck v. Field Support Servs., Inc.*, 702 F. Supp. 2d 84, 93 (E.D.N.Y. 2010). It "is one of production, not persuasion; it 'can involve no credibility assessment.'" *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 142 (2000) (quoting *St. Mary's*, 509 U.S. at 509). Defendant has satisfied its burden here with evidence that the decision to terminate Plaintiff was based on complaints concerning Plaintiff's behavior at work.

Defendant has produced ample evidence in the record to support this contention. Both Sullivan and Schafler testified that they received numerous complaints regarding Plaintiff's performance from both customers and other Club Helsinki employees. (Dkt. No. 33-4, at 59, 61, 88-90, 108; Dkt. No. 30-8, ¶¶ 5-6). Sanchez, one of Plaintiff's coworkers, submitted an affidavit attesting to an incident in which Plaintiff shoved a rack of glasses at her and cursed at her. (Dkt. No. 30-6, ¶ 7). Terminating Plaintiff's employment due to conduct issues with coworkers and customers would clearly be a legitimate, nondiscriminatory reason. *See Cross v. N.Y. City*

*Transit Auth.*, 417 F.3d 241, 250 (2d Cir. 2005) (noting that a failure to "perform satisfactorily"

is a legitimate, nondiscriminatory reason for dismissal); *Ramos v. Marriott, Int'l, Inc.*, 134 F.

Supp. 2d 328, 343 (S.D.N.Y. 2001) (stating that the "failure of an employee to get along with

coworkers rebuts the employee's prima facie case").

### 3.     Pretext

Since Defendant has offered a legitimate, nondiscriminatory reason for terminating

Plaintiff, the "presumption of discrimination drops from the picture" and the burden shifts back

to Plaintiff, who must "come forward with evidence that the defendant's proffered, non-

discriminatory reason is a mere pretext for actual discrimination." *Weinstock v. Columbia Univ.*,

224 F.3d 33, 42 (2d Cir. 2000). In other words, the Court must "now ask whether, without the aid

of the presumption" of discrimination raised by the prima face case, the plaintiff "has raised

sufficient evidence upon which a reasonable jury could conclude by a preponderance of the

evidence that the decision to fire him was based, at least in part," on a discriminatory reason.

*Holcomb v. Iona Coll.*, 521 F.3d 130, 141 (2d Cir. 2008). "[A] plaintiff may rely on evidence

comprising [his] prima facie case . . . together with other evidence such as inconsistent employer

explanations, to defeat summary judgment at that stage." *Zann Kwan v. Andalex Grp. LLC*, 737

F.3d 834, 847 (2d Cir. 2013). Pretext may be shown, inter alia, "by demonstrating weaknesses,

implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate"

nondiscriminatory reasons for its action. *Id*. at 846.

Plaintiff argues that a reasonable juror could find that Defendant's nondiscriminatory

reason is pretextual because Defendant "has offered several reasons for its adverse actions."

(Dkt. No. 31, at 16). Defendant argues that given the complaints Schafler and Sullivan received

about Plaintiff, and the evidence submitted supporting these complaints, there is nothing that

indicates firing Plaintiff due to performance was pretextual. (Dkt. No. 30-9, at 22-23). However,

Defendant does not address the inconsistency between this rationale for terminating Plaintiff and the rationale given to Plaintiff and the EEOC— a reduction in overall business. A jury may infer pretext from Defendant's inconsistent reasons for the termination.

In affidavits submitted as part of the EEOC investigation, Schafler and Sullivan both averred that they acted due to reduced staffing needs. (Dkt. No. 33-20, ¶ 12 (Affidavit of Sullivan averring that, with respect to Plaintiff's allegation that his "hours were cut in half," "employee scheduling is based solely upon the needs of the club."); Dkt. No. 33-18, ¶¶ 7-8 (Affidavit of Schafler averring that Plaintiff's hours were "reduced after the holidays" as "part of an overall reduction in workforce going into the winter season" and Plaintiff was terminated "as part of our seasonal staff reduction")). Neither mentioned any performance concerns or complaints, let alone that any complaints contributed to his termination or reduction of hours. Plaintiff's termination letter similarly listed the reason for the termination as "a work force reduction," and offered to give Plaintiff a letter of recommendation. (Dkt. No. 33-19, at 2). Neither Schafler nor Sullivan spoke to Plaintiff about any complaints they may have received other than a single conversation Sullivan allegedly had with Plaintiff about sending servers home early. (Dkt. No. 38-1, at 16; Dkt. No. 33-4, at 61).

In light of the inconsistency between the legitimate, nondiscriminatory reason Defendant now offers, and the prior reasons given for Plaintiff's termination, there is a triable issue of fact as to whether Defendant's proffered reason was pretextual. *See Belfi v. Prendergast*, 191 F.3d 129, 139 (2d Cir. 1999) (holding that "[c]ircumstantial evidence in the form of differing and inconsistent explanations from the [defendant] raise questions of fact to rebut its alleged non-discriminatory reasons for the wage disparity, and may provide the jury with a basis to find pretext"); *EEOC v. Ethan Allen, Inc.*, 44 F.3d 116, 120 (2d Cir. 1994) (finding that where the

defendant "originally discounted performance as a determinative factor" for the plaintiff's

termination only to later cite performance problems as a reason for the plaintiff's termination, "a

reasonable juror could infer that the explanations given by [the defendant] at trial were

pretextual"); *Lashley v. New Life Bus. Inst., Inc.*, No. 13-cv-2683, 2015 WL 1014128, at *6,

2015 U.S. Dist. LEXIS 28383, at *15-16 (E.D.N.Y. Mar. 9, 2015) (holding that where

defendants "presented multiple, inconsistent reasons for plaintiff's firing" "jury was entitled to

take this evidence and determine that defendants were unable to present a cohesive, legitimate,

non-discriminatory reason for plaintiff's termination"). Given the evidence that Sullivan

propositioned Plaintiff by suggesting his shifts would improve if Plaintiff slept with him, the

worsening of his employment conditions beginning with the reduction in shifts within months of

this proposition and ending a few months later with his termination, Sullivan's direct

involvement in his termination, and Defendant's inconsistent reasons for his termination,

Plaintiff has raised a material issue of fact as to whether Defendant's decision to fire him was

based, at least in part, on *quid pro quo* sexual harassment. Accordingly, Defendant's motion for

summary judgment on Plaintiff's *quid pro quo* sexual harassment claim is denied.

## V.      CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendant's motion for summary judgment (Dkt. No. 30) is **DENIED**.

**IT IS SO ORDERED.**

Dated:   June 16, 2021
          Syracuse, New York

Brenda K. Sannes
U.S. District Judge